IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

| | | |
|---|---|---|
| **ROSEMARY JUSTICE,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:11CV00026 |
| | ) | |
| v. | ) | **OPINION** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | By: James P. Jones |
| **COMMISSIONER OF** | ) | United States District Judge |
| **SOCIAL SECURITY,** | ) | |
| | ) | |
| Defendant. | ) | |

*Gregory R. Herrell, Arrington Schelin & Herrell, P.C., Bristol, Virginia, for Plaintiff. Eric P. Kressman, Regional Chief Counsel, Region III, Andrew C. Lynch, Assistant Regional Counsel, Charles Kawas, Special Assistant United States Attorney, Office of the General Counsel, Social Security Administration, Philadelphia, Pennsylvania, for Defendant.*

In this social security case, I affirm the final decision of the Commissioner.

I

Plaintiff Rosemary Justice filed this action challenging the final decision of the Commissioner of Social Security (the "Commissioner") denying her claims for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits pursuant to Titles II and XVI of the Social Security Act ("Act"), 42

U.S.C.A. §§ 401-433, 1381-1383d (West 2003 & Supp. 2011). Jurisdiction of this court exists pursuant to 42 U.S.C.A. §§ 405(g) and 1383(c)(3).

Justice filed for benefits on March 25, 2008, alleging that she became disabled on March 3, 2008. Her claim was denied initially and upon reconsideration. Justice received a hearing before an administrative law judge ("ALJ"), during which Justice, represented by counsel, and a vocational expert testified. The ALJ denied Justice's claim, and the Social Security Administration Appeals Council denied her Request for Reconsideration. Justice then filed her Complaint with this court, objecting to the Commissioner's final decision.

The parties have filed cross motions for summary judgment, which have been briefed. The case is ripe for decision.

II

Justice was born on August 14, 1962, making her a younger person under the regulations. 20 C.F.R. § 404.1563(c) (2011). Justice has a tenth grade education and has worked in the past as an administrative clerk, certified nursing assistant, fast food worker, and caregiver. She originally claimed she was disabled due to a blood disorder, foot pain, fibromyalgia, migraines, back problems, anxiety, and depression.

In November 2005, Justice sought treatment from Robert L. Hudgins, M.D., for complaints of distal paresthesias. Motor and sensory nerve conduction studies were normal.

In January and February 2006, Justice sought treatment from Victor A. Maquera, M.D., for complaints of headaches and increased burning and aching pain in her feet. Autoimmune lab results were normal. Dr. Maquera noted that walking decreased Justice's foot pain. He prescribed Elavil and Sinemet.

On August 22, 2006, Justice was involved in an automobile accident. Following the accident, she sought treatment from Joseph M. Shaughnessy, M.D., for complaints of neck pain and numbness and swelling in her right shoulder. Dr. Shaughnessy diagnosed Justice with headaches, cervicalgia, a sprain/strain in the cervical region, and a cervical muscle spasm. He placed her on a conservative physical therapy plan and referred her for a MRI and nerve condition studies. In September 2006, a MRI of the cervical spine revealed a C5-6 disc bulge and chronic spur. In October 2006, nerve condition studies were normal.

From September 2006 through December 2006, Justice underwent physical therapy with Elizabeth Robinson, LMT. During this time period, Justice complained of a severe grade of dull pain that occurred constantly on her right side in her upper back and neck. Robinson reported that Justice had "measurable improvement" over the course of her therapy. (R. at 330.) At the end of physical

therapy, Dr. Shaughnessy indicated that Justice had a 6% impairment of her total body function.

In October 2007, Justice sought treatment from Murshid A. Al-Awady, M.D.., for complaints of chronic headaches. Dr. Al-Awady diagnosed her with migraines and prescribed Fiorinol and Elavil.

In a follow-up visit in November 2007, Justice stated that she had not been taking Fiorinol and that Elavil was ineffective. Dr. Al-Awady noted that, two years earlier, Justice underwent a full neurological evaluation with negative findings. He prescribed Vicodin, Ambien, and Topamax.

A couple of weeks later, Justice returned to Dr. Al-Awady with complaints of low back pain. A lumbar spine study revealed mild degenerative changes but no acute fractures. Dr. Al-Awady reported no paresthesia or weakness of either extremity. He recommended physical therapy.

In March 2008, Justice presented to the emergency department at Baptist Medical Center after a fall at home. The attending physician diagnosed Justice with a closed fracture of the right foot. He prescribed Lortab.

Justice sought treatment from Dr. Al-Awady in March 2008. She complained of worsening pain in her back and right foot. Justice stated that she had been unable to work since her fall. (R. at 370.) Dr. Al-Awady noted that

Justice's range of motion, muscle strength, and muscle tone were normal. He prescribed Lortab.

In June 2008, Peter Knox, M. Ed., Psy. D., completed a mental status evaluation. Upon examination, Dr. Knox observed that Justice's memory was intact, that she had no significant issues with concentration and persistence, and that she had no significant impairment in work-related mental activities. He noted that Justice had never sought professional help for mental health issues. (R. at 387.) Dr. Knox diagnosed Justice with an adjustment disorder with depressed mood. He assessed a GAF score of 60.[1]

In June 2008, William V. Choisser, M.D., conducted a consultative examination at the request of Justice's attorney. Dr. Choisser noted that Justice's main complaint was that she could not stand or walk for too long a period of time. (R. at 390.) He diagnosed her with a right foot injury, fibromyalgia, extensive migraines, and back pain.

Angeles Alvarez-Mullin, M.D., a state agency psychiatrist, reviewed Justice's medical records in June 2008. Dr. Alvarez-Mullin reported that Justice had adjustment disorder with depressed mood, but that her mental impairment was

---

[1] The GAF scale is a method of considering psychological, social and occupational function on a hypothetical continuum of mental health. The GAF scale ranges from 0 to 100, with serious impairment in functioning at a score of 50 or below. Scores between 51 and 60 represent moderate symptoms or a moderate difficulty in social, occupational, or school functioning, whereas scores between 41 and 50 represent serious symptoms or serious impairment in social, occupational, or school functioning. See Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 1994).

not severe. Dr. Alvarez-Mullin noted that Justice's adjustment disorder caused only mild restrictions in her daily activities. In September 2008, Carol Deatrick, Ph.D., a state agency psychologist, independently reviewed Justice's medical records and agreed with Dr. Alvarez-Mullin's assessment.

In July 2008, Susan L. Hicks completed a physical residual functional capacity evaluation. She opined that Justice was capable of performing a range of light work. In September 2008, Edward DeMiranda, M.D., also completed a physical residual functional capacity evaluation and agreed with Hicks' assessment.

Justice sought treatment from D.N. Patel, M.D., from September 2008 through September 2009. During this time period, she complained of back and leg pain, headaches, nervousness, and depression. Dr. Patel prescribed Elavil, Celexa, Vistaril, Inderol, and Zantac. He opined that Justice was unable to work due to her depression. (R. at 455.)

Justice sought treatment at Thompson Family Health Center from January 2009 through September 2009. Justice complained of frequent crying spells, feelings of hopelessness, panic attacks, and migraines. Crystal Burke, LCSW, diagnosed her with depressive and anxiety disorder. Burke allowed Justice to verbally vent and encouraged relaxation techniques. She stated that Justice had "some minimal relief" while on medication. (R. at 492.)

-6-

Case 1:11-cv-00026-JPJ-PMS   Document 25   Filed 02/28/12   Page 6 of 14   Pageid#: 598

In July 2009, Robert C. Miller, Ed. D., completed a mental status evaluation at the request of Justice's attorney. Upon examination, Dr. Miller observed that Justice's thought processes were logical and coherent; she was fully oriented; she was able to maintain concentration for more than several minutes during the examination; her level of intellectual functioning was in the low-average range; and there was no evidence of hallucinations or perceptual disturbances. Dr. Miller diagnosed Justice with major depressive disorder and panic disorder with agoraphobia. On a form regarding Justice's ability to perform mental work-related activities, Dr. Miller indicated that Justice had poor ability to relate to co-workers, deal with the public, deal with work stresses, and understand complex job instructions. He assessed a GAF score of 45.

In August 2009, Ronald W. Brill, Ph.D., completed a mental status examination at the request of Justice's attorney. Dr. Brill observed that Justice displayed deficiencies in concentration, but had adequate attention, memory, and cognitive functioning. He noted that Justice had never been hospitalized nor gone to the emergency room for treatment of emotional problems. (R. at 448.) Dr. Brill diagnosed Justice with anxiety disorder and major depressive disorder, single episode. On a form regarding Justice's ability to perform mental work-related activities, Dr. Brill indicated that Justice had poor ability to deal with work

stresses, maintain attention and concentration, understand complex job instructions, and demonstrate reliability. He assessed a GAF sore of 50.

In August 2009, an X ray of Justice's lumbar spine revealed only generalized demineralization. The vertebral bodies and disc spaces were normal.

In November 2009, Mary Ann Collier, FNP, completed a physical assessment of Justice's ability to do work-related activities. She indicated that Justice could only stand or sit two hours in an eight-hour workday.

In December 2009, Justice was evaluated at the University of Virginia for fibromyalgia and lupus. Alice Doyal, FNP, opined that it was unlikely that Justice had lupus. Doyal indicated that Justice walked with a normal gait, had normal deep tendon reflexes, displayed no muscle weakness, and maintained muscle strength.

In January 2010, an X ray of the lumbar spine revealed only mild scoliosis centered at L3-L4. Otherwise, alignment of the spine was maintained and there was no significant vertebral body or intervertebral disc height loss.

At the administrative hearing held in November 2009, Justice testified on her own behalf. Justice stated that she was no longer able to complete daily activities such as watch television, cook, shop, pay bills, listen to the radio, or go to the movies. Justice confirmed that she did occasionally drive to visit her daughter. A vocational expert also testified. He classified Justice's past work as an

administrative clerk as light, semi-skilled; her past work as a certified nursing assistant as medium to heavy, semi-skilled; her past work as a fast food worker as light, unskilled; and her past work as a caregiver as medium, skilled.

After reviewing all of Justice's records and taking into consideration the testimony at the hearing, the ALJ determined that she had severe impairments of migraine headaches, fibromyalgia, degenerative disc and joint disease of the cervical spine, degenerative joint disease of the lumbar spine, the residuals of a right foot fracture, depression, and anxiety, but that none of these conditions, either alone or in combination, met or medically equaled a listed impairment.

Taking into account Justice's limitations, the ALJ determined that Justice retained the residual functional capacity to perform a range of light work that involved occasionally climbing ramps and stairs, balancing, stooping, kneeling, crouching, and crawling. However, the ALJ stated that Justice should not climb ladders, ropes, or scaffolds, and should avoid even moderate exposure to hazards in the workplace such as moving mechanical parts, unprotected heights, and excessive background noises. She was limited to only occasional contact with the public. The vocational expert testified that someone with Justice's residual functional capacity could work as a garment sorter, an office helper, and a laundry folder. The vocational expert testified that those positions existed in significant numbers in the national economy. Relying on this testimony, the ALJ concluded

-9-

Case 1:11-cv-00026-JPJ-PMS   Document 25   Filed 02/28/12   Page 9 of 14   Pageid#: 601

that Justice was able to perform work that existed in significant numbers in the national economy and was therefore not disabled under the Act.

Justice argues that the ALJ's decision is not supported by substantial evidence because the ALJ improperly determined Justice's residual functional capacity. For the reasons below, I disagree.

III

The plaintiff bears the burden of proving that she is under a disability. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). The standard for disability is strict. The plaintiff must show that her "physical or mental impairment or impairments are of such severity that [s]he is not only unable to do h[er] previous work but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C.A. § 423(d)(2)(A).

In assessing DIB and SSI claims, the Commissioner applies a five-step sequential evaluation process. The Commissioner considers whether the claimant: (1) has worked during the alleged period of disability; (2) has a severe impairment; (3) has a condition that meets or equals the severity of a listed impairment; (4) could return to her past relevant work; and (5) if not, whether she could perform other work present in the national economy. *See* 20 C.F.R. §§ 404.1520(a)(4),

416.920(a)(4) (2011).  If it is determined at any point in the five-step analysis that the claimant is not disabled, the inquiry immediately ceases.  *Id.*; *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983).  The fourth and fifth steps of the inquiry require an assessment of the claimant's residual functional capacity, which is then compared with the physical and mental demands of the claimant's past relevant work and of other work present in the national economy.  *Id.* at 869.

In accordance with the Act, I must uphold the Commissioner's findings if substantial evidence supports them and the findings were reached through application of the correct legal standard.  *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996).  Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks and citation omitted).  Substantial evidence is "more than a mere scintilla of evidence but may be somewhat less than a preponderance."  *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).  It is the role of the ALJ to resolve evidentiary conflicts, including inconsistencies in the evidence.  *Seacrist v. Weinberger*, 538 F.2d 1054, 1956-57 (4th Cir. 1976).  It is not the role of this court to substitute its judgment for that of the Commissioner.  *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).

Justice argues that the ALJ's determination is not supported by substantial evidence.  First, Justice argues that the ALJ improperly determined her mental

residual functional capacity by giving too little weight to the opinions of Dr. Miller, Dr. Brill, and Dr. Patel.

In weighing medical opinions, the ALJ must consider factors such as the examining relationship, the treatment relationship, the supportability of the opinion, and the consistency of the opinion with the record. 20 C.F.R. § 404.1527(d) (2011). Although treatment relationship is a significant factor, the ALJ is entitled to afford a treating source opinion "significantly less weight" where it is not supported by the record. *Craig*, 76 F.3d at 590.

In the present case, the ALJ considered the opinions of Dr. Miller and Dr. Brill, but gave little weight to their assessments, for several reasons. First, Dr. Miller and Dr. Brill's relationships with Justice were limited — their opinions were based on one-time examinations, made at the request of Justice's attorney. Second, the opinions of these evaluators are inconsistent with their own mental evaluations as well as the other medical evidence of record. For instance, Dr. Brill assessed a GAF score of 50, indicating serious symptoms or limitations; yet, he noted that Justice had adequate attention, memory, and cognitive functioning, and that she had never been hospitalized nor treated at the emergency room for emotional problems. (R. at 446-49.) Similarly, Dr. Miller assessed a GAF score of 45; however, he reported that Justice's thought processes were logical and coherent, she was fully oriented and able to maintain concentration, her level of intellectual

-12-

Case 1:11-cv-00026-JPJ-PMS   Document 25   Filed 02/28/12   Page 12 of 14   Pageid#: 604

functioning was in the low-average range, and there was no evidence of hallucinations or perceptual disturbances. (R. at 439-45.) Furthermore, Dr. Miller noted that Justice's MMPI-2 results were "invalid due to possible random responding or exaggeration," which casts doubt on the sincerity of Justice's alleged symptoms. (R. at 441.)

With respect to Dr. Patel, the ALJ's assessment of his opinion is also supported by substantial evidence. Although Dr. Patel was Justice's treating physician, his mental assessment of Justice was limited — Dr. Patel never conducted any psychological testing. Furthermore, Dr. Patel's conclusion is not well-supported by the other evidence of record. For example, Dr. Patel opined that Justice was unable to work due to depression. However, this is contrary to consistent reports from Thompson Family Health that Justice was negative for remarkable psychiatric problems. (R. at 478-79, 481-82, 484-85, 487-88.)

Finally, Justice argues that the ALJ improperly determined her physical residual functional capacity by giving too little weight to Collier's finding that Justice cannot work full time. This argument is without merit. The ALJ's assessment is consistent with the record, which shows that Collier's opinion is inconsistent with the medical evidence of record. For example, in August 2009, an X ray of Justice's lumbar spine showed general demineralization, but normal vertebral bodies and disc spaces. (R. at 496.) In January 2010, an X ray of the

lumbar spine revealed only mild scoliosis. (R. at 498.)  Additionally, several treating sources reported that Justice had normal gait, muscle strength, and deep tendon reflexes, and that her central nervous system was free of neurological deficit. (R. at 455, 479, 512.)  Given this evidence, I agree with the ALJ's decision to afford little weight to Collier's conclusion.

IV

For the foregoing reasons, the plaintiff's Motion for Summary Judgment will be denied, and the defendant's Motion for Summary Judgment will be granted.  A final judgment will be entered affirming the Commissioner's final decision denying benefits.

        DATED:   February 28, 2012

        /s/  James P. Jones
        United States District Judge